# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### April 12, 2011 Session

## STATE OF TENNESSEE v. WALTER ANDREW WARE

**Direct Appeal from the Circuit Court for Obion County**
**No. CC-09-CR-133    William B. Acree, Jr., Judge**

---

**No. W2010-01992-CCA-R3-CD  - Filed October 7, 2011**

---

An Obion County jury convicted the Defendant, Walter Andrew Ware, of aggravated child abuse, aggravated child neglect, and aggravated child endangerment. The trial court merged the convictions and sentenced him to sixteen years, to be served at 100%. On appeal, the Defendant contends that the evidence presented, which was circumstantial, is insufficient to sustain his conviction and that the trial court made an improper ruling during voir dire. After a thorough review of the record and applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, Jr., J., joined.

William K. Randolph and Joseph P. Atnip, Dresden, Tennessee, for the Appellant, Walter Andrew Ware.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarance E. Lutz, Assistant Attorney General; Thomas A. Thomas, District Attorney General, and Kevin McAlpin, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from injuries sustained by an infant girl, who was subsequently admitted to the hospital. For these injuries, the Obion County grand jury indicted the victim's mother, Jacqueline Elendt, and father, the Defendant, on charges of aggravated child abuse, aggravated child neglect, and aggravated child endangerment. Elendt pled guilty to child abuse and child neglect, Class E felonies, and agreed to testify against the Defendant.

At the Defendant's trial, the following evidence was presented: N.W.'s mother, Jacqueline Elendt, testified that the Defendant was N.W.'s father and that N.W. was born on May 21, 2009. After N.W.'s birth, she and the Defendant brought N.W. to live with them at the Defendant's mother's house. The Defendant's mother "pretty much" kicked them out of her home, and they went to live in Union City with Dana Northam, a woman whom Elendt had met through the Defendant and with whom she worked at an Arby's restaurant. The couple and N.W. had lived with Northam for approximately one month before N.W.'s admission to the hospital on July 30, 2009.

Elendt testified that she never hurt N.W., and she recalled the events leading to N.W.'s hospitalization. She said that, on July 28, a Tuesday, she worked at Arby's Restaurant from 11:30 a.m. until 4:30 p.m., while N.W. stayed with the Defendant, who was unemployed. When she left for work that morning, N.W. appeared fine. When she returned, the Defendant "barely [let her] take care of [N.W.]" who had slept a lot that day. Elendt said that, in hindsight, N.W.'s sleepiness was unusual, but she did not notice it at the time. N.W. awoke two or three times during the night on Tuesday night, and the Defendant got up with her each time. Elendt said that, on Wednesday morning, the couple took N.W. to the courthouse, and she held N.W. while they were driving. It was then that she noticed bruises on N.W.'s face. She asked the Defendant about the bruises, and he told her that "she was a baby and to leave it alone." Elendt said that, while this answer did not satisfy her, she was scared of the Defendant, so she did not inquire further.

Elendt said that upon their return to Northam's house N.W. appeared to be acting fine. Elendt recalled that she and the Defendant then took N.W. to pick up Northam's son and take him to Arby's Restaurant where Northam was working. They returned to Northam's house, only to leave again to retrieve Northam's son from Arby's Restaurant. Elendt said she, the Defendant, and Northam's son played together with the neighborhood children and with N.W., who still appeared fine. Elendt recalled that she did not hold N.W. during this time and that the Defendant primarily took care of her.

At 2:00 a.m. on the following Thursday morning, N.W. awoke with a fever. Elendt said she got up with N.W. and gave her infant Tylenol in an attempt to reduce her fever. When that did not work, she offered N.W. a bottle of milk, which N.W. drank "really fast" and then "threw up." Elendt said she woke up Northam and asked Northam if she had a thermometer, to which Northam responded negatively. At that point, Elendt noticed that N.W. was "shaking on one side of her body and her eyes were twitching," so she woke the Defendant telling him that they needed to go to the hospital. The Defendant "was like man, let me see her. So [Elendt] handed [N.W.] to him and he just looked at her and he didn't want to go." Northam, who was also awake, joined Elendt in encouraging the Defendant to

take N.W. to the hospital until he finally acquiesced. As they were getting into the car, the Defendant said to Elendt, "It's gonna be [you] and [me] if there was nothing wrong with her."

On cross-examination, Elendt said that "Emmanuel," Northam's boyfriend, also lived at Northam's house with her, the Defendant, N.W., and Northam's son, who was six or seven. Elendt said that, at one point after N.W.'s birth, for approximately three days she and N.W. lived with Elendt's parents. The Defendant did not live with them, and Elendt was N.W.'s primary caretaker. Elendt agreed that, in accordance with her agreement with the State, she received a two year sentence on judicial diversion. She agreed she was going to plead guilty to Class E Felony child abuse and neglect, both pleas of which would be dismissed if she complied with the rules of diversion for two years.

Elendt agreed that the Defendant sometimes detailed cars to earn money. She said she did not recall Northam ever watching N.W. so that the Defendant could work. After reviewing her statement to the Department of Children's Services ("DCS"), she agreed that it indicated she told them that Northam watched N.W. so that the Defendant could "go everywhere and wash people's cars." Elendt said she did not recall if Northam's son was present when Northam watched N.W.

Dana Northam testified that she had known the Defendant for five years because the Defendant's cousin was the father of Northam's son. Through the Defendant she met Elendt, with whom she worked at Arby's restaurant. Two weeks before this incident, the Defendant, Elendt, and N.W. moved into Northam's house, where she lived with her six-year-old son and her boyfriend. Northam said that she babysat N.W. a "few times" for "a couple of hours" while they lived with her. Northam said, however, that she never babysat for N.W. while the Defendant was working because he did not ever go to work while he lived with her. Northam testified that she never saw any behavior that caused her concern. She said she once saw a bruise on N.W.'s forehead, but, after she was told N.W. bumped her head, she did not suspect anything.

Northam recalled that during the early morning hours of Thursday July 30, 2009, Elendt knocked on her bedroom door upset because there was something wrong with the baby. She wanted a thermometer to check N.W.'s temperature, and Northam could not find one. Northam said that Elendt and the Defendant began arguing because Elendt wanted to take N.W. to the hospital and the Defendant did not. After they left for the hospital, police arrived at her house to investigate allegations that N.W. was abused. Northam denied ever shaking N.W. and denied ever seeing anyone else shake N.W.

On cross-examination, Northam agreed she had previously stated that both Elendt and

3

the Defendant came into her room looking for a thermometer. Northam said she never saw either parent do anything she deemed "inappropriate" with N.W. or endanger N.W. in any way. On redirect examination, Northam testified that the Defendant normally took care of N.W. and that, even when Elendt was home, the Defendant "had" N.W. more than Elendt.

Todd Wright, a Union City Police officer, testified that he responded to a call from hospital staff about the possible child abuse of N.W. He arrived at the hospital before N.W. was transferred to Memphis for treatment, and, after seeing the child, he interviewed the Defendant and Elendt, who were at the hospital. They told him that N.W. was from "Big Sandy," which immediately caused him concern because that was several hospitals away. He later determined that they had been staying with Northam in Union City immediately before N.W.'s hospitalization. Officer Wright observed N.W and he noticed bruising and seizure activity, which caused her eyes and arms to "jerk[]." The officer showed the jury pictures taken of N.W. that morning.

Dr. Karen Lankin, the Medical Director for Lebonheur Child Assessment Program at Lebonheur Children's Medical Center in Memphis, testified as an expert in the field of pediatric medicine. Dr. Lankin said that she served as a consulting physician for abused children. She explained that, when children come to the hospital, they often had medical conditions that, at the beginning, were unclear and may involve multiple sub-specialities. The treating physicians often consult the "child assessment program" that the hospital has to assist them in gathering all the information from the sub-specialists and to work with the families. The consulting physician from the child assessment program also communicates with the Department of Children's Services ("DCS"), if necessary.

Dr. Lankin recalled that Union City hospital transferred N.W. to LeBonheur Children's Medical Center, on July 30, 2009, and on that same day N.W.'s treating physician sought Dr. Lankin's consultation. Dr. Lankin reviewed N.W.'s records, spoke with all the doctors involved in treating N.W., and examined N.W. herself. When Dr. Lankin examined N.W., N.W. had been classified as in "critical condition" and admitted into the pediatric intensive care unit. She had come to the emergency room with a high fever and suffering seizures. Dr. Lankin observed bruises on N.W.'s arms, torso, back, right thigh, above her right cheek and right eyelid, and on her right ear. The infant had fractures of her right ninth, tenth, and eleventh ribs, and her left seventh, eighth, ninth, and eleventh ribs. She also had two "corner" fractured tibias, one each in her lower legs, and a third "corner" fracture to her right femur. N.W.'s CT scan also indicated that she may have suffered a skull fracture, but the CT was unclear because of the swelling. The doctor explained that a "corner" fracture is very unusual unless there is some type of "torsion or twisting motion." Therefore, these injuries are "highly suspicious for non-accidental trauma" because it is not the type of accidental injury usually suffered by an infant or a child. Dr. Lankin testified that these

4

injures could have been caused by N.W.'s being shaken to the point that her ribs were flailing back and forth.

N.W. was also diagnosed as having "extensive retinal hemorrhages" in both her eyes that went through both the intra-retinal and pre-retinal areas. This finding also would have been "very unusual" in an otherwise healthy child. Doctors also found "extensive bleeding or hemorrhaging on both hemispheres of N.W.'s brain and a significant area of a hematoma in the area of her brain that ran between the hemispheres called the "falx." N.W.'s injuries, including the fractures, retinal hemorrhaging, and intra-cranial bleeding indicated that N.W. had suffered abusive head trauma. The doctor opined that N.W.'s seizures had been caused by the injuries to her tissue and the lack of oxygen that occurred with that type of injury.

Dr. Lankin said that doctors were unable to definitively determine precisely how old the injures were but that they were no more than "a few days old." She explained that, at first, the radiologist reading the X-rays had opined that the fractures were a few days old because he believed he saw that they were "healing." Dr. Lankin explained, however, that what looked like "healing" on the X-rays could also have been caused by hematomas forming around the fractures, which would indicate that the injuries occurred much more recently than "a few days." The doctor said that after gathering N.W.'s medical history, and the statements from her caregivers, she determined that all N.W.'s injuries occurred during one event within 72 hours of her first CT scan.

Dr. Lankin testified that the force required to cause N.W.'s injuries was so great that any reasonable person would have recognized that it would have hurt or injured a child. N.W.'s injuries were consistent with "Shaken Baby Syndrome," and the injuries were life-threatening.

On cross-examination, Dr. Lankin agreed that an infant can suffer skull fractures from falling, including falling out of someone's arms or off of a changing table. In most cases, skull fractures heal by themselves without specific symptoms or consequences. The doctor conceded that the skull fracture, by itself, could have been a result of a forceps extraction during the child's birth. She also agreed that an infant's fever could be a "precipitating factor" to the child suffering a seizure. Dr. Lankin testified that N.W.'s pediatric records indicated that Jacqueline Elendt, N.W.'s mother, was her primary caretaker.

Calvin Walter Ware, the Defendant's father, testified that he saw N.W. about three times a month. He said N.W. was doing "pretty good . . . considering," and was crawling and talking. She, he said, seemed like a normal one-year-old child. On cross-examination, Ware said he was unaware whether N.W. still took seizure medication, and he did not know if she had been assessed for developmental delays or vision impairment.

Based upon this evidence, the jury convicted the Defendant of aggravated child abuse, aggravated child neglect, and aggravated child endangerment. The trial court merged the convictions, and sentenced the Defendant to sixteen years, to be served at 100%.

## II. Analysis

On appeal, the Defendant contends that the evidence presented, which was circumstantial, is insufficient to sustain his conviction and that the trial court made an improper ruling during voir dire.

### A. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his conviction. He asserts that all the evidence against him is circumstantial and, while it may have proven he was a suspect, it does not amount to evidence that he committed this crime beyond a reasonable doubt. He contends that there were multiple people who had access to N.W. during the time frame in which her injuries occurred, including Northam, Northam's six-year-old son, Northam's boyfriend, and Elendt. The Defendant also notes that the main testimony against him came from Elendt, who was legally considered an "accomplice." The State counters that both direct and circumstantial evidence supported the jury's verdict that the Defendant violently abused N.W.

It is well-established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this Court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). The jury's verdict of guilt, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v.*

*Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

The guilt of a defendant, as well as any fact required to be proved, may be established by direct evidence, by circumstantial evidence, or by a combination of both. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Recently, in *State v. Sisk*, our Supreme Court clarified the use of circumstantial evidence as a basis for a conviction. 343 S.W.3d 60, 65 (Tenn. 2011). In *Sisk*, the defendant was convicted of aggravated burglary and theft at trial, primarily on the basis of circumstantial evidence. *Id.* at 63-64. The circumstantial evidence involved a cigarette butt that was found at the scene and contained a match to the defendant's DNA. *Id.* On appeal, this Court reversed, holding that the evidence was insufficient to support the convictions. *Id.* at *60. The State appealed, arguing that the convictions should be reinstated. *Id.* On appeal our Supreme Court chronicled the history of the use of convictions based on circumstantial evidence stating:

> A criminal offense may, of course, be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973); *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 456-58, 461 (1958). Ultimately, however, the jury must decide the significance of the circumstantial evidence, as well as "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable*, 313 S.W.2d at 457). Appellate courts may not substitute their own inferences for those drawn by factfinders in circumstantial evidence cases. *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010).

> Years ago, in *State v. Crawford*, 225 Tenn. 478, 470 S.W.2d 610 (1971), this Court adopted a standard of proof in criminal prosecutions based exclusively upon circumstantial evidence that purportedly required the State to prove facts and circumstances "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *Id.* at 612. This Court also stated in *Crawford* that in such cases, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 613. This language was recited for years by Tennessee courts as controlling in those cases in which the sufficiency of exclusively circumstantial evidence was at issue; indeed, it was used by both the Court of Criminal Appeals and the trial court in this case. *See Sisk*, 2010 WL 3502512, at *2. In *State v. James*, 315 S.W.3d 440, 455 n.14 (Tenn. 2010), however, we pointed out the inconsistency between the terminology employed in *Crawford*

7

and its progeny and the standard of proof applied by the United States Supreme Court in those cases in which the evidence is solely circumstantial. *See Jackson*, 443 U.S. at 326, 99 S. Ct. 2781 (rejecting the notion "that the prosecution [i]s under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt"). Finally, in *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011), we adopted the federal standard in Tennessee and eschewed any distinction between the standard of proof required in cases based solely upon circumstantial evidence and that in cases where direct evidence of guilt is presented by the State. Although we observed in *Dorantes* that, as a practical matter, there was little difference between the federal standard and the "reasonable hypothesis" language used in *Crawford*, we also noted that, depending on the nature of the circumstantial evidence presented at trial, the adoption of the federal standard of proof could result in a different outcome in some cases. *Id.*

*Id*. at 65 (footnotes omitted). Based on that reasoning, our Supreme Court reinstated the defendant's convictions, finding:

The undamaged condition of the cigarette butt, Detective Grooms' testimony that it was unlikely the cigarette had been tracked into the house and that the victims themselves were not smokers, the proximity of the Defendant's residence to the burglarized house, the fact that the Defendant often was seen smoking outside and had never been invited into the victims' residence, and the Defendant's flight from police on January 3, 2007, all corroborate the DNA evidence. While the intermediate appellate court posited that "[s]everal plausible explanations for the presence of the defendant's cigarette inside the victims' residence come to mind, including that the cigarette butt was 'tracked' into the residence," *Sisk*, 2010 WL 3502512, at *3, our duty on appeal of a conviction is not to contemplate all plausible inferences in the Defendant's favor, but to draw all reasonable inferences from the evidence in favor of the State. Given Detective Grooms' description of the cigarette butt and its location [on the bottom of his shoe], it was perfectly reasonable for the jury to believe the State's theory that the Defendant had entered the victims' residence during the burglary and left the cigarette butt there. The evidence is sufficient to support the jury's verdict.

*Id*. at 67-68 (footnote omitted). By reinstating the convictions in *Sisk*, our Supreme Court made clear that "[t]he standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275

8

(Tenn. 2009)).

Applying the analysis utilized in *Sisk* and *Dorantes* to the case herein, we review the evidence at trial in a light most favorable to the State. To sustain the Defendant's conviction for aggravated child abuse, the State had to prove that the Defendant committed the offense of child abuse or neglect, and the conduct resulted in serious bodily injury to the child. *See* T.C.A. § 39-15-402(a)(1) (2009). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." T.C.A. § 39-15-401(a) (2006). Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty . . . ." T.C.A. § 39-11-106(a)(2) (2006). "'Serious bodily' injury means bodily injury that involves: [a] substantial risk of death; [p]rotracted unconsciousness; [e]xtreme physical pain; [p]rotracted or obvious disfigurement; or [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" T.C.A. § 39-11-106(a)(34)(A)-(E) (2006). The Tennessee Supreme Court, in *State v. Mateyko*, described the child abuse and neglect statute as a single offense which a defendant may commit "through one of two courses of conduct: child abuse through injury and child abuse through neglect." 53 S.W.3d 666, 668, n.1 (Tenn. 2001) (citing *State v. Hodges*, 7 S.W.3d 609, 622 (Tenn. Crim. App. 1998)). Similarly, the State may establish aggravated child abuse by either of these methods, in addition to serious bodily injury to the child. T.C.A. § 39-15-402(a)(1) (2006); *Hodges*, 7 S.W.3d at 622-23; *State v. Ducker*, 27 S.W.3d 889, 895-96 (Tenn. 2000).

Doctors' examinations of N.W. revealed that, in addition to fever and seizures, she suffered bruises on her arms, torso, back, right thigh, above her right cheek and right eyelid, and on her right ear. Seven of her ribs were fractured, on both her anterior and posterior sides, and both her tibias and one of her femurs had "corner" fractures, which occurred when the bone was twisted. N.W. suffered "extensive retinal hemorrhages" and extensive hemorrhaging on both hemispheres of her brain. There was also a significant hematoma in the area of her brain running between her two hemispheres. The doctor opined that N.W.'s injuries indicated that she suffered abusive head trauma that was consistent with "Shaken Baby Syndrome." The doctors were unable to determine precisely when the injuries occurred but definitively determined they occurred within 72 hours of her hospital admission.

The evidence also proved that the Defendant was not working during the time frame in which N.W. was injured and that he cared for N.W. while N.W.'s mother, Elendt, was working. Northam, the woman with whom the couple lived, testified that she did not babysit N.W. during this time period and that the Defendant normally took care of N.W., even when Elendt was home. Northam also recounted how, in the early morning hours before N.W.'s hospital admission, Elendt came to her room seeking a thermometer to assess N.W.'s

9

temperature. Elendt implored the Defendant to take N.W., who was seizing and hot with fever, to the hospital, and the Defendant stated his reluctance to seek medical treatment for N.W. to both Elendt and Northam. After Elendt and the Defendant "argued" and after Northam encouraged the Defendant to take N.W. to the hospital, the Defendant finally acquiesced. When loading N.W. into the car to go to the hospital, the Defendant told Elendt that it would be "him and her" if the hospital trip was unnecessary.

We conclude that a rational jury could have inferred that the Defendant's reluctance to seek medical treatment for N.W. indicated that he had hurt the child and did not want doctors to examine her. In the 72 hours preceding N.W.'s hospitalization, the Defendant and Elendt were N.W.'s caretakers and, by all accounts, the Defendant "had" N.W. even when Elendt was home, and he kept N.W. when Elendt was working. Elendt testified before the jury and denied hurting N.W. Hearing the evidence, the jury determined that the Defendant was the only one who could have injured N.W., and we will not disturb their interpretation of the evidence.

The Defendant specifically argues that his conviction cannot stand because it was based largely upon his accomplice Elendt's testimony. It is well-settled that in Tennessee, "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). An accomplice is one "who knowingly, voluntarily and with common intent unites with the principal offender[s] in the commission of the crime." *State v. Ballinger*, 93 S.W.3d 881, 887 (Tenn. Crim. App. 2001). When "a witness denies involvement in the crime, the question of whether he or she is an accomplice is one of fact to be submitted to the jury with proper instructions from the court on how to consider such testimony." *Id.* at 887-88.

The law in Tennessee regarding accomplice testimony has been described as follows:

The rule simply stated, is that there must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Shaw*, 37 S.W.3d at 903 (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)

10

(citations omitted). Whether sufficient corroboration exists is a determination for the jury. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994).

In this case, Elendt denied that she harmed N.W. or that she knew the Defendant harmed N.W. She testified that she pled guilty because she felt neglectful for returning to the Defendant and leaving N.W. in the Defendant's care. The court instructed the jury that Elendt was an accomplice and charged the jury to find whether Elendt's testimony had been sufficiently corroborated. On appeal, we must presume that the jury followed the trial court's instructions. *State v. Banks*, 271 S.W.3d 90, 134 (Tenn. 2008). We presume the jury properly considered Elendt's testimony, along with the other testimony presented, and we affirm the jury's finding of guilt. Northam's testimony corroborates Elendt's testimony that the Defendant was alone with N.W. immediately before the injuries. Therefore, the Defendant is not entitled to relief on this issue.

## B. Voir Dire

The Defendant next contends that the trial court erred when it sustained the State's objection preventing defense counsel from telling the jury that the crime for which the Defendant was charged was the "most serious" felony. The State counters that the trial court did not abuse its discretion in this regard.

During voir dire, the jury was sworn and the trial court instructed the jury on the charges involved in the case, stating:

> [Y]ou've been summoned as prospective jurors in a criminal case which involves the alleged aggravated child abuse, aggravated child neglect and aggravated child endangerment which allegedly occurred in Obion County.

The State's attorney then introduced himself and gave a brief overview of the allegations supporting the charges. The State's attorney asked the venire if they knew any of the parties involved, and then asked follow-up questions based upon their responses. The State's attorney then explained the "reasonable doubt" standard, and asked the jury if they could follow this standard. The State's attorney explained direct and circumstantial evidence, and informed the jury that the victim's mother had pled guilty to child abuse and would testify against the Defendant. The State's attorney informed the jury that this case involved child abuse and asked if anyone had suffered abuse as a child. The trial court excused the two jurors that responded affirmatively.

The Defendant's counsel then introduced himself and responded to the State's example of circumstantial evidence and stated:

11

[Defendant's counsel]: What if there's not any evidence at all? You can't convict them - cannot convict without evidence? Could you convict, convict them just because of the charge that they're just charged with child abuse? Do each of y'all realize that this is a Class A Felony?

I think we've tried several cases here during this term of court. We've tried - I think I've tried all of them with y'all. I don't think y'all have tried any with anybody else. That's unusual. It's just how the cookie crumbles sometimes. I think we've had an A Misdemeanor, a D Felony and a D Felony and now we've got an A Felony. This is the most serious (inaudible). But this is the most –

[State's Attorney]: Can - can we approach?

(**WHEREUPON,** bench conference was held, to-wit:)

[State Attorney]: I mean, that's not the truth. This is not the most serious felony.

THE COURT: Objection sustained.

(**WHEREUPON,** bench conference was concluded.)

[Defense Counsel]: Would each of y'all agree with me that there are several different kinds of felonies with E felonies being the least and A, of A through E the A would be the most serous?

[State's Attorney]: I'm still objecting. That's –

[Defense Counsel]: I'd be happy to explain that a little bit better, Your Honor –
[State's Attorney]: Well, it's an inappropriate –

[Defense Counsel]: – that there is –

(**WHEREUPON,** bench conference was held, to-wit:)

THE COURT: I thought I sustained the objection, did I not?

[Defense Counsel]: I am understand that there are A through E, with E -

12

with A being the most serious.

>THE COURT: They know that. I tell them that during orientation.

>[Defense Counsel]: You did?

>THE COURT: yeah. I always do, every single time.

Article I, section 9 of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." In fact, every accused is guaranteed "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation." *State v. Schmeiderer*, 319 S.W.3d 607, 624-25 (Tenn. 2010) (citing *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993)). Thus, the function of voir dire is essential. *Id.* Voir dire permits questioning by the court and counsel in order to lead respective counsel to the intelligent exercise of challenges. *Id.* A trial court is vested with great discretion in conducting the selection of a fair and impartial jury. *State v. Howell*, 868 S.W.2d 238, 247 (Tenn. 1993), *cert. denied* 510 U.S. 1215 (1994); *State v. Harris*, 839 S.W.2d 54, 65 (Tenn. 1992), *cert. denied*, 507 U.S. 954 (1993); *see* Tenn. R. Crim. P. 24(a). Thus, this Court must uphold the trial court's ruling unless the defendant establishes the existence of a clear abuse of discretion. *State v. Raspberry*, 875 S.W.2d 678, 681 (Tenn. Crim. App. 1993).

Although Rule 24(a) of the Tennessee Rules of Criminal Procedure provides that the trial court "shall permit questioning by the parties for the purpose of discovering bases for challenge for cause and enabling an intelligent exercise of peremptory challenges[,]" the trial court, in the exercise of its discretion, controls the questions that can be asked to keep the voir dire within relevant bounds. *State v. Austin*, 87 S.W.3d 447, 476 (Tenn. 2002).

In the case under submission, the statement posed to the jury, namely that this was the "most serious felony" was not a question at all. It was not designed to elicit a response that would assist counsel in the intelligent exercise of challenges. *See Howell*, 868 S.W.2d at 247. We conclude that the trial court did not abuse its discretion when it prohibited defense counsel from telling the jury that the crime with which the Defendant was charged was the "most serious felony" or explaining to the jury the grading of offenses. It appears from the record that the defense counsel's comment came after the defense attorney reminded the venire that he had tried multiple cases in front of the venire. The trial court sustained the objection, informing defense counsel that it had already instructed the jury on the grading of offenses. The record also shows that defense counsel had ample opportunity to question the jury about any potential biases. Therefore, the trial court did not abuse its discretion in this

13

regard.  The Defendant is not entitled to relief on this issue.

## III.  Conclusion

Having thoroughly reviewed the record and relevant authorities, we conclude that the evidence is sufficient to sustain the Defendant's conviction and that the trial court did not err during voir dire.  As such, we affirm the trial court's judgment.

_____

ROBERT W. WEDEMEYER, JUDGE